No. 2979

Second Circuit

———

CANNON v. MENGEL & BROTHER CO.

———

(February 3, 1928. Opinion and Decree.)
(March 14, 1928. Rehearing Refused.)
(May 7, 1928. Writs of Certiorari and Review Denied by Supreme Court.)

———

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Negligence—Par. 11.**
Where the night engineer at a saw mill told the night watchman not to allow boys to remain on the boilers, but these boys after being told by the night watchman to do so, slept on the "dutch oven" of one of the boilers; the boys were either trespassers or licensees, they were not invitees.

2. **Louisiana Digest—Negligence—Par. 8, 11, 12.**
The only duty that the owner of the saw mill owes to trespassers or licensees is not to wilfully or wantonly disregard their safety.

3. **Louisiana Digest—Negligence—Par. 8, 9, 10, 11.**
Where one boy was killed and another injured by steam while they were asleep on the "dutch oven" of a boiler of a saw mill where they were either trespassers or licensees, the slight negligence of one of the employees in removing the "spider bolts" while hot water and steam remained in the boiler is not such wilful or wantonly disregard of the safety of the boys, whose presence he did not know which would hold the saw mill company liable.

Appeal from the Fifth Judicial District Court, Parish of Richland. Hon. John R. McIntosh, Judge.

Action by Mrs. Nellie Cannon against C. C. Mengel & Brother Company.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed with costs.

Matthew C. Redmond; L. F. Grigsby, of Monroe, attorneys for plaintiff, appellant.

George Wesley Smith, of Rayville, attorney for defendant, appellee.

ODOM, J. On the night of November 4, 1923, Elmer and Roamy Fields, two boys, both minors, went to the saw mill plant of the defendant in Rayville, Louisiana, climbed up on what is called the "dutch oven" of one of the boilers, and went to sleep. Late in the night, and while they were asleep, steam and hot water escaped through the man head of the boiler, scalding them so badly that Elmer died and Roamy is crippled.

These boys were the grandchildren of Mrs. Nellie Cannon, the plaintiff, who brings this suit in her capacity as tutrix of Roamy Fields, who survived the accident. She asks for a large sum for the death of Elmer Fields, for the use and benefit of the brother, Roamy, and for damages in behalf of said Roamy Fields for injuries received by him and for his pain and suffering.

She alleges that said boys were invited to go upon defendant's premises, get on the "dutch oven" and go to sleep, by the employees and agents of defendant, and that hot water and steam were permitted to escape from the boiler by and through the gross fault and negligence of defendant's employees.

Defendant answered, denying that its agents and employees were guilty of any negligence, and alleged that said Fields boys were trespassers upon its premises, they having gone into the engine room and upon the boiler without the invitation or consent of any of defendant's employees who had authority to give such consent, and that said boys were invited and permitted upon defendant's premises by one Wave Cannon, uncle of the boys, said Cannon being night watchman whose duty it was to keep trespassers off the premises, and that said Wave Cannon violated instructions of the defendant by permitting said boys to remain; that said boys were orphans, both parents being dead, and looked to the said Wave Cannon, their uncle, for advice, shelter and protection, and that on this occasion he took charge of them and permitted them to go into the engine room and upon the boiler, where they were injured, and that he assumed all risks; and alleged that even if it be held that its employees were guilty of some negligence in permitting hot water and steam to escape from the boiler, it discharged toward said boys all the duty it owed to them under the circumstances.

The District Judge rejected plaintiff's demands and she prosecutes this appeal.

### OPINION.

The fact that hot water and steam escaped from the man-head of the boiler and scalded Elmer Fields to death and badly injured the other boy, Roamy, while they were asleep on the "dutch oven," is not disputed. Elmer Fields was so badly scalded and burned that he died shortly after being carried to a sanitarium, and the other boy, although he survived, suffered intensely for a long period and is probably permanently injured.

But primarily, of course, the court must determine whether the defendant is liable for these injuries and damages. The lower court found and held that defendant was not at fault and rejected plaintiff's demands.

The facts, briefly stated, are that the Fields boys, Elmer aged 15 and Roamy about 13, were orphans, their father and mother both having died when the boys were small children. They had lived with and been reared by their grandmother, Mrs. Nellie Cannon, who being a widow herself had lived with her daughters and sons-in-law. At the time of this accident she was living in Rayville with her daughter, Mrs. Reed, and the younger of the two boys, Roamy Fields, was living in that family. The older boy, who was about fifteen years old, possibly a little older, was well grown and developed for his age and was working at the time as a saw mill hand at Dehlco, a short distance south of Rayville. On this occasion he left Dehlco, after work hours, and went to Rayville where he joined his younger brother. The two ate supper at a restaurant and then attended a minstrel show, the older boy paying the expenses. After the show, the two went to the home of their uncle-in-law, Reed, where Roamy lived, to go to bed. Reed, it seems, did not like the older boy and for that reason refused them admission to the house. It was a cold night, and not having a place to stay or sleep they sought their uncle, Wave Cannon, who was night watchman at defendant's mill plant. Whether they went to him to get permission to sleep in or around the mill is not disclosed, but as he was their mother's brother and the only relative they had to whom they might appeal after being turned away by Reed, presumably they looked to him for advice and protection.

When they got to the mill premises, they stopped at the engine room and found Paul Reed (not their uncle-in-law) in charge as night engineer. Wave Cannon, their uncle, was out on his rounds. He soon came in and when it came time for him to make another round, as he was required to do every hour, the younger boy went out with him. When they got back they found the older boy, Elmer, at the engine room with Paul Reed.

As to what took place and was said at the engine room when the boys first reached there and when Wave Cannon and the younger boy got back is of importance as it bears upon the status of the boys upon the premises; whether they were there and remained with Reed's consent or invitation, or whether they occupied the premises over his protest—in other words, whether they were invitees or trespassers upon the premises.

Paul Reed was the night engineer and had full charge and control of the engine house and boilers at night. It was his privilege and duty to keep trespassers away from the engine room. Wave Cannon, the uncle of the boys, was night watchman, whose duty it was to go over the entire mill property every hour, punch the clocks, keep trespassers away and report fires.

Reed, the night engineer, Cannon, the night watchman, and all other employees of the defendant company had specific and positive instructions not to permit any persons other than employees to loiter around or trespass upon the property, and it was expressly understood that no one should be permitted to remain at night or sleep in the engine room.

Roamy Fields, who survived the accident, testified that when he and his brother reached the engine room Paul Reed, the night engineer, invited them to sit down, and Wave Cannon and Roamy Fields both say that Reed not only invited the boys to stay but told them to get up on the boilers and go to sleep, which they did.

Reed emphatically denies this. He says he told the boys and told Cannon that they must not remain on the premises, that such

was against the rules of the company, and says he told Cannon to take the boys to the office, which was steam heated, and let them stay there, but that Cannon insisted that they would be safe on the boilers and that they be permitted to stay there during the night. He says he did not give his consent to their remaining in and around the engine room and boilers, and that he did not attempt to forcibly eject them because they were nephews of Cannon who had charge of them and that he did not want a personal encounter with Cannon.

We do not think Reed, the night engineer, invited the boys to come or remain on the premises or that he voluntarily consented thereto. His passive acquiescence under the circumstances is not equivalent to an invitation. Certain it is that the boys were not invitees of the company. They were there over the protest of the general manager. Cannon invited the boys to remain, but in doing so he not only exceeded his authority but he violated specific instructions. It was his duty as night watchman to keep trespassers off the premises. His invitation to the boys was not binding upon defendant.

The boys knew they were violating the rules of the defendant company. They were well grown and well developed for their ages. Elmer himself was a saw mill hand. They were therefore upon defendant's property not as invitees but without any business there; they were not servants of the company and stood in no contractual relation with it. They were upon the premises for their own interest and convenience. They had no business with any employee of defendant, except their uncle, Cannon, and they sought him only for assistance in getting a place to sleep. They were therefore either trespassers or licensees upon the property, and in as much as the law makes no distinction between tres-

passers and licensees in so far as the property owner's duty to them is concerned, we shall not attempt to say whether these boys were trespassers or licensees. They unquestionably fall in the one or the other class.

As to the duty of the owner of the premises toward trespassers and licensees, the general rule is stated as follows in 20 R. C. L., page 59, section 53:

"No distinction is to be drawn, according to the general use of the terms, between persons coming within the description of 'licensees' and those who are trespassers. Doubtless for some purposes a licensee has greater rights than a trespasser, but in this situation they are upon an equality. The obligation owed to all such persons as are upon the premises without right is the same, merely not to wilfully and intentionally injure them; or, as it is sometimes expressed, not to injure them after becoming aware of their presence. To warrant a recovery for an injury, a trespasser must show that it was wantonly inflicted, or that the owner or occupant being present, could have prevented the injury by the exercise of ordinary care after discovering the danger."

The law is similarly expressed by other text writers.

In the case of Forshee vs. Grant, 152 La. 303, 93 South. 102, the plaintiff entered the back room of defendant and while there sat down upon the head of a barrel which had on it concentrated lye and he was injured. The court found that plaintiff was not an invitee but had entered in the hope of getting a bucket of beer, and the court said:

"Having entered the wareroom without invitation, expressed or implied, the defendant owed plaintiff no greater duty than to see that he was not wantonly or purposely injured. And even if the employees of defendant waited upon plaintiff instead of putting him out of the wareroom, it was no place for loitering and the empty

whiskey barrel, standing over in the corner with other barrels, boxes and junk, was in no sense an attractive nor an inviting and convenient place for repose and rest."

In stating that the owner owes no duty to one upon his premises without invitation, express or implied, except to see that he is not wantonly or wilfully injured, the court in the case cited, supra, held in line with the jurisprudence of other states.

Our own court has repeatedly held that the owner of premises does not owe to trespassers the same duty that it owes to those lawfully thereon.

Dorsey vs. K. C. P. & G. Ry. Co., 104 La. 478, 29 So. 177.

Reary vs. L. N. O. & T. Ry. Co., 40 Ann. 32, 3 South. 390.

Candiff vs. L. N. & T. Ry. Co., 42 Ann. 477, 7 South. 601.

Holmes vs. Crowell & S. Lumber Co., 51 Ann. 352, 25 South. 265.

These boys being trespassers or licensees upon defendant's property were not entitled to the same degree of consideration and protection as they would have been if they had been lawfully upon the premises as employees or invitees. But they were unquestionably entitled to some consideration, and if the facts warrant a holding that the employees of defendant were so grossly careless in the operation of the machinery as to indicate a wanton and wilful disregard of their safety after their peril was discovered, or if any of the defendants or their agents or employees, being present, could have saved them after their peril was discovered and failed to do so, plaintiff is entitled to recover.

The boys went to sleep on the "dutch oven" on top of the boiler. This was not a dangerous place. As evidence of that fact, Paul Reed, the engineer, who was thoroughly familiar with machinery, went to sleep at the same place and was there when the hot water and steam escaped through the man-head. The danger arose only when the assistant to the night engineer attempted to prepare the boilers to be cleaned out on the following morning.

It is not contended that it was negligence to permit the boys to get upon the boilers and go to sleep. But plaintiff's contention is that there was negligence in handling the machinery after they got on the boilers. The facts pertinent to the issue of negligence as alleged by plaintiff, are these.

The defendant used five boilers in the operation of its saw mill, numbered 1, 2, 3, 4 and 5. These boilers were all connected with steel framing and pipes. It was customary to wash and clean the inside of the boilers on Sunday, and it was necessary in order to do so to let the boilers cool on the Saturday night previous. The steam and water were let out through the mud valves and then the man-head was removed so that the boilers could be washed. Reed, the night engineer, ordered Bob McDuffie, his helper, to prepare boilers 3, 4 and 5 to be cleaned, but told him not to disturb boilers 1 and 2. Bob McDuffie misunderstood him and after preparing boilers 3, 4 and 5 proceeded to prepare the other two as well. The boys as well as Reed were on boiler number 2. In order to open the man-head it was necessary to remove a large metal plate which covered it. This metal plate was held in place by a metal bar called the "spider" which is fastened to the boiler by bolts called "spider bolts." The metal plate covers the man-head from the inside and is held in place by pressure from within, so that when the pressure from within is removed the plate falls in of its own weight, provided the bolts are first removed. If the bolts are not first re-

moved, the "spider" remains in place, even after the pressure from within is removed by letting out the water and steam through the mud valve.

On this occasion Bob McDuffie, the helper, removed the "spider bolts" from boiler number 2, where the boys were sleeping. On doing so, he discovered that there was still steam and water in the boiler and that the man-head could not, for that reason, be removed. He then started down a ladder to the ground, intending to open the mud valve, whereupon Wave Cannon, who happened to be there at the time and who understood what was being done, opened the valve. After the lapse of some fifteen minutes the pressure was sufficiently removed for the cap over the mud valve to fall in. When that happened, hot water and steam blew out through the mud valve and enveloped the boys and they were scalded.

Plaintiff contends that Bob McDuffie was negligent in removing the "spider bolts" while hot water and steam remained in the boiler, that the water and steam should first have been drawn and the bolts removed later, and there is testimony in the record to the effect that the latter course was the proper and prudent method to pursue. There is testimony that there was danger of the plate over the man-head falling in and leaving the man-head open in case the bolts were removed. However, there is testimony that this would not necessarily follow.

Our conclusion is that McDuffie should have first opened the mud valve and let the water and steam out and then removed the bolts, and that in failing to pursue that method he was guilty of some negligence. Although we think the negligence slight.

There was no wilful or wanton disregard of the safety of the boys. McDuffie, who is a colored man, no doubt made a mistake, but his mistake was not unnatural. Wave Cannon, the uncle of the boys, is a white man and had worked about saw mills and boilers for many years, and is presumed to know how to proceed in such cases. The testimony shows that he opened the mud valve for McDuffie. It would therefore seem that he anticipated no danger to any one. Certainly McDuffie anticipated no danger, for Paul Reed, his superior, was also asleep with the boys.

The boys were in no danger until the man-head was opened. It was then too late to save them.

Under the law cited and quoted and under the circumstances, we do not think the defendant is liable.